UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

PARIS L. JAMES,                    :
                                   :
          Plaintiff               :     No. 1:14-CV-01951
                                   :
     vs.                           :     (Judge Kane)
                                   :
DAVID VARANO, et al.,              :
                                   :
          Defendants              :

<u>MEMORANDUM</u>

I.   <u>Background</u>

          On October 8, 2014, Paris L. James, an inmate at the
State Correctional Institution at Coal Township, Pennsylvania
("SCI-Coal Township") filed a 51-page complaint consisting of 260
paragraphs against 16 named individual defendants and a total of
14 "John and Jane Doe" defendants, employed by the Pennsylvania
Department of Corrections at SCI-Coal Township.

          The complaint was brought pursuant to 42 U.S.C. § 1983.
The named individual defendants waived service of the complaint.
Excluding the "John and Jane Doe" Defendants, there were two
groups of defendants each represented by counsel.  The first group
consisted of 14 defendants (David Varano, Kathryn McCarthy, Lori
Alleman, Thomas Mosier, Keith Tripp, Lieutenant Masser, Sgt.
Krzykowski, Sgt. Else, and Corrections Officers Baker, Schoch,
Rodriguez, Burrows, Novalis, and Kratz), which the court will
refer to as the "Corrections Defendants."  The second group
consisted of two defendants, physician assistants Brian Davis and

Jennifer Daya, who the court will refer to as the "Medical Defendants."   James in the complaint raised several claims, including that he was denied adequate medical care, and requested an award of compensatory and punitive damages.

On March 23, 2015, James filed a document entitled "Amended Civil Rights Complaint Pursuant to 42 U.S.C. Section §1983" (Doc. No. 28) which was docketed by the Clerk of Court as a "Proposed Document."   The amended complaint named the same two groups of individual defendants as well as a total of 14 "John and Jane Doe" defendants.[1] (Id.) By order of September 25, 2015, the original complaint was stricken from the record, the amended

---

1.   The original complaint named the defendants in their individual and official capacities. The amended complaint which consists of 356 paragraphs (1) eliminates the official capacity claims against the defendants; (2) divides some of the 260 paragraphs of the original complaint and renumbers them and adds additional paragraphs relating, inter alia, to a conspiracy to violate James' rights under the 8th Amendment and the involvement of Defendant Verano; (3) corrects the spelling of the names of several of the defendants; and (4) sets forth the possible names of two of the "John and Jane Doe" defendants but continues to refer to them as "John and Jane Doe" defendants throughout the amended complaint.
         It is well-settled that the use of John/Jane Doe defendants, absent compelling reasons, will not suffice and the district court may dismiss such defendants if plaintiff, after being granted a reasonable period of discovery, fails to identify the defendants. Sheetz v. Morning Call, 130 F.R.D. 34, 37 (E.D. Pa. 1990).  Based on this court's review of the record, although his action was filed almost two years ago, James has not yet provided this court with the identities of the John Doe and Jane Doe defendants and information sufficient to complete service on them.  Thus, this court will grant James ninety (90) days from the date the court decides the pending motions to dismiss to properly identify the John Doe and Jane Doe defendants and provide sufficient information to effect service.  If plaintiff fails to timely identify those defendants, they shall be dismissed from this action under the authority of Sheetz.

complaint was accepted as properly filed, and the Corrections
Defendants and Medical Defendants were authorized to file
dispositive motions in response to the amended complaint. (Doc.
No. 29.)

On October 13, 2015, the Medical Defendants filed a
motion to dismiss (Doc. No. 30) the amended complaint and on
October 27, 2015, a brief in support. (Doc. No. 32.)  On October
15, 2015, the Corrections Defendants filed a motion to dismiss
(Doc. No. 31) the amended complaint and on October 29, 2015, a
brief in support. (Doc. No. 33.)  On November 4, 2015, James filed
a motion for an extension of time (Doc. No. 34) to file a brief in
opposition to the defendants' motion to dismiss.  James did not
specify which motion to dismiss.  Furthermore, also on November 4,
2015, James filed a document entitled "Plaintiff's Motion In
Opposition to Defendants (sic) Motion to Dismiss filed Pursuant to
Fed. R.Civ.P. 12(b)(6)." (Doc. No. 36.)  Although docketed by the
Clerk as a brief, the document was not a proper brief in
opposition.  By order of November 5, 2015, the court denied
James's so-called motion in opposition to defendants' motion to
dismiss and granted James's motion for extension of time. (Doc.
No. 37.) James was authorized to file a brief in opposition to the
motions to dismiss on or before December 30, 2015. (Id.)  On
December 28, 2015, James complied with the order of November 5,
2015, and filed briefs in opposition. (Doc. Nos. 39, 40.)  On
January 14, 2016, the motions to dismiss became ripe for

disposition when the Corrections Defendants and Medical Defendants elected not to file reply briefs.  For the reasons set forth below, both motions will be granted in part and denied in part.

## II.  <u>Motion to Dismiss</u>

Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir.2009) (quoting <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d Cir.2008)).  While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 556). "[L]abels and conclusions" are not enough, <u>Twombly</u>, 550 U.S. at 555, and a court "'[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" <u>Id.</u> (quoted case omitted).

4

In resolving the motion to dismiss, we thus "conduct a two-part analysis." Fowler, supra, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. Id. at 210-11.  Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 211 (quoted case omitted).

## III.  Statement of the Factual Allegations of the Amended Complaint

The initial factual allegations in the amended complaint relate to James's confinement at the State Correctional Institution at Forest, Marienville, Pennsylvania ("SCI-Forest") and his subsequent transport to the State Correctional Institution at Smithfield, Huntingdon, Pennsylvania ("SCI-Smithfield"), where he was turned over to "John Doe" Correctional Officers from SCI-Coal Township for transport to that facility.

James alleges that on October 8, 2012, while confined in the RHU at SCI-Forest "under administrative custody" he "collapsed" and was then taken to the prison infirmary where he received 10 bags of intravenous fluid for dehydration. (Doc. No. 28, at 6.)  James claims that, prior to his collapse, he experienced an inability to breath, dizziness, an irregular and rapid heart rate, excessive sweating and an inability to eat. (Id.) James alleges that he has a history of asthma and uses an inhaler to assist his breathing but that medical personnel at SCI-

5

Forest were not permitting him to have access to the inhaler.[2] (Id.)

James claims that he remained in the prison infirmary for "part of the day" of October 9, 2012, but was then released to the RHU "without any specific medical testing" or being provided with his asthma inhaler. (Id.)  He then claims that, on October 10, 2012, he was informed that he would be transferred to SCI-Coal Township, "a transfer which had been pending for several months[.]" (Id. at 7.)  James claims that he was processed out of SCI-Forest and turned over to transporting correctional officers on October 11, 2012, even though he was "still severally ill" and in need of medical care. (Id.)  James states that he was loaded onto a transport van and taken to SCI-Smithfield where he was turned over to transporting correctional officers from SCI-Coal Township. (Id.)

James contends that, upon being turned over to the transporting officers from SCI-Coal Township, John Doe #1 and John Doe #2, he informed them that he was having difficulty breathing, his heart was beating abnormally fast, he was dizzy and felt

---

2.  SCI-Forest is located in Forest County which is within the jurisdiction of the United States District Court for the Western District of Pennsylvania. SCI-Smithfield is located in Huntingdon County which is within the jurisdiction of the Middle District. No individuals employed at SCI-Forest or SCI-Smithfield are named as defendants in the present action. A review of the docket of the Western District of Pennsylvania reveals that James has an action pending in that court which, inter alia, relates to his collapse on October 8, 2012. James v. Sauers, et al., No. 1:14-CV-00069 (W.D.Pa. filed Mar. 3, 2014)(PACER).

faint, and he had asthma and needed his inhaler.(Id.)  James claims that the transporting officers observed that he struggled to speak and maintain his balance; and he was sweating profusely, coughing and gasping for air. Id. at 8. James claims that he told John Does #1 and #2 that he had collapsed while housed at SCI-Forest and was treated in the infirmary at that facility for dehydration.  He told John Does # 1 and #2 he needed to see medical personnel at SCI-Smithfield, but  they ignored his pleas. They told him that he could wait until he arrived at SCI-Coal Township to see medical personnel and that their job was merely to transport him to SCI-Coal Township, and they did not have time to deal with his medical complaints because they had additional inmates to transport after they dropped him off at SCI-Coal Township. (Id. at 8-11.)  James claims as a result of the conduct of the transporting officers he suffered unnecessary pain, he continued to struggle to breath, and he remained dizzy and drifted in an out of consciousness. (Id. at 11.)

Upon arriving at SCI-Coal Township, James claims he was unable to exit the van because of his condition and he was forcefully removed from the van by the transporting officers who used unnecessary and excessive force. (Id. at 12.)  James alleges he was ushered into the intake area and ordered to stand in a line with other inmates. (Id.)  James claims that he was unable to stand so he "broke the line formation" and sat down on a nearby chair but two correctional officers, John Doe #3 and John Doe #4,

7

immediately approached him and ordered him to stand up and return to the line formation. (Id. at 12-13.) James alleges that he attempted to explain that he was an asthmatic and having difficulty breathing as well as suffering from chest pain but John Does # 3 and #4 responded by stating "they didn't give a [expletive] what [his] reasoning was for breaking the line formation, and . . . ordered [him] to stand up and return to the line." (Id.) James claims that he informed John Does #3 and #4 of his recent medical treatment at SCI-Forest and that they were able to observe that he was gasping, coughing, sweating profusely and having difficulty speaking. (Id.) James alleges that because he was unable to comply with the orders, John Does #3 and #4 grabbed him out of the chair and, using excessive and unnecessary force, pinned him against a wall for the purpose of causing physical pain. (Id. at 14.) James claims they started yelling at him "you are getting off on the wrong foot." (Id.)

James claims that while he was pinned against the wall, Defendant Masser, John Does #1, #2 and #5 approached, and Defendant Masser, as the superior officer, refused to intervene even though he could observe James's physical condition and was not acting aggressively. (Id. 14-15.) James further alleges that he informed Defendant Masser of his physical problems and what transpired at SCI-Forest, SCI-Smithfield and during the trip from SCI-Forest. (Id. at 15-16.) James contends he asked Defendant Masser to notify medical personnel of his condition and that

8

Defendant Masser refused to do so but had James placed in a
holding cell and told James he would be left for last for
processing because of his medical complaints and for disrupting
the intake processing procedures. (<u>Id.</u> at 17.)  James alleges that
John Does #1 and #2, before leaving to transport other inmates,
informed John Does #3, #4 and #5 and Defendant Masser that James
had been complaining about the lack of medical care from the time
they took possession of him at SCI-Smithfield and that James had
been charged with assaulting a correctional officer at SCI-Forest.
(<u>Id.</u> at 16-17.) James further alleges that Defendant Masser stated
that "he would show Plaintiff who's in control" by placing him in
the holding cell and denying him medical care. (<u>Id.</u>)

       After John Does #3, #4 and #5 placed James in the
holding cell, James alleges that he collapsed and continued to
have difficulty breathing, his heart rate was rapid, he was dizzy
and he had chest tightness and pain. (<u>Id.</u> at 17-18.) James alleges
that he lay on the floor for an "indeterminate period of time"
until Defendant Masser and John Does #3 and #4 came to the holding
cell and that they continued to decline to contact medical
personnel. (<u>Id.</u> at 18.)  Instead James claims that they
"repeatedly banged on the cell door ordering [him] to submit
himself to be restrained to be moved not to the infirmary, but to
the restricted housing unit[.]" (<u>Id.</u>)

       After being threatened with physical force, James
alleges that he mustered the little strength he had left and

pulled himself off the floor and at that point an escort team
arrived consisting of John Does #6, #7, #8 and #9 and Defendants
Schoch and Baker. (Id. at 19.)  James alleges that when Defendants
Baker and Schoch and John Doe # 6 opened his cell door and ordered
him to step out, he nearly fell on his face because of his
physical condition and Defendants Baker and Schoch had to hold him
up. (Id.)  James claims at that point he requested that he be
allowed to speak with a Captain or medical personnel because he
was in unbearable pain but Defendant Masser ignored his pleas and
ordered Defendants Baker and Schoch to physically force him to
walk to the RHU. (Id. at 20.)  James alleges that Defendants Baker
and Schoch complied with Defendant Masser's order and attempted to
force him to walk to the RHU but he was unable to do so because he
was dizzy, dehydrated and having difficulty breathing; they ended
up physically dragging him to the RHU. (Id. at 21.)

       James claims that when he arrived at the RHU he was
dragged to a strip cage, holding cell, and thrown into it. (Id.)
After being thrown into the cell, he claims he again requested to
be seen by medical personnel and informed Defendants Masser,
Baker, Schoch and John Doe #6 that they had a duty to inform
medical personnel of his request. (Id. at 22.) James alleges that
Defendant Masser responded by stating "he didn't give a
[expletive] what happened to Plaintiff, that "Plaintiff doesn't
order Defendants to do anything" and "he would decide if and when

Plaintiff would see medical personnel, or receive anything while in the institution." (Id.)

James claims that, after an unspecified period of time, John Doe #10, who he believes was a Registered Nurse named Matt Hyde, arrived at his RHU cell door and asked him what was wrong. (Id.) James claims that he informed John Doe #10 of what had transpired at SCI-Forest and that John Doe # 10 could observe that he was having a difficult time talking and breathing, he was coughing and wheezing, and that he was sweating profusely. (Id. at 22-23.) James claims that he told John Doe #10 that he was dizzy, dehydrated and that his heart was beating rapidly and that he had been unable to eat or drink for "multiple days." (Id.)  James contends that, although John Doe #10 observed his symptoms, he did nothing except ask Defendant Masser what had happed to James. (Id.)  Defendant Masser responded by stating that James had just kept complaining about being sick. (Id.) James claims at one point John Doe #10 stated that he could not place James in the infirmary because of lack of space and left after telling Defendant Masser to give James a sick-call slip and the morning medical shift would decide whether to admit James to the infirmary. (Id. at 24.)

After John Doe #10 left without providing James with his asthma inhaler, James alleges that he was removed from the holding cell and dragged by Defendants Baker, Masser, Schoch and John Doe #6 to Pod 4 and placed in a cell. (Id. at 25.)  James claims that after being thrown into the cell he collapsed on the floor because

of his pain, exhaustion, fatigue, dehydration, chest pain and lack
of his asthma inhaler.(Id.) James alleges that at about 5:00 p.m.
Defendant Masser, while supervising the delivery of the evening
meal to inmates, came to James cell and found James collapsed on
the floor and barely conscious. (Id.)  James claims that Defendant
Masser and another officer ordered James to get up and turn his
cell light on if he wanted his food tray. (Id.) James alleges that
he was too weak to comply and that they left without providing him
with his evening meal which exacerbated his condition. (Id. at
26.)

        James next claims that between 6:30 and 7:00 p.m., on
October 11, 2012, while he was collapsed on his cell floor,
Defendant Alleman appeared at his cell door escorted by Defendant
Baker. (Id.) The purpose of the visit was to complete a medical
intake questionnaire. (Id.) James alleges that Defendant Alleman
observed his symptoms and he claims that, even though he was
exhausted, he explained to her what had happened at SCI-Forest,
that he was suffering from extreme pain, that he had not eaten in
days, and that he needed his asthma inhaler. (Id. at 26-27.)  He
further alleges that he told Defendant Alleman that John Doe #10
had been informed of his medical condition but refused to provide
him with his asthma inhaler or any other medical care and refused
to admit him to the infirmary but merely told him to sign up for
sick call. (Id. at 27.)  James claims that Defendant Baker
overhearing the conversation told Defendant Alleman that James was

being overly dramatic and that James was "one of those problematic and complaining inmates."(Id.)  James alleges that, although Defendant Alleman could see that he needed medical attention, Defendant Alleman told him he would have to sign up for sick call and left without providing him with any medical care. (Id.)

James next alleges that at about 8:00 p.m on October 11, 2012, Jane Doe #1, Registered Nurse (who James believes was "Patrica Kulenguskey"), delivered medication to other inmates on Pod 4. (Id. at 28.)  James claims that while Jane Doe #1 was delivering medication to the inmate in the cell next to his, he notified Jane Doe #1 of his medical condition and that he had not eaten anything in days, his heart was racing and he was dizzy. (Id.)  James alleges he went through the litany of his symptoms with Jane Doe #1 and informed her of the incident at SCI-Forest.(Id.)  James claims that Jane Doe #1 responded by stating that she was only passing out medications and his concerns should be addressed through a grievance and sick call; she left without addressing his medical needs. (Id. at 29.)

James contends that he then completed "the sole sick call form" which he found in his cell.(Id.) James then alleges that the next day on October 12, 2012, between 7:00 a.m. and 9:00 a.m, Defendant Daya, a nurse practitioner or doctor, came to his cell on Pod 4, as a result of the sick call request. (Id.) James states that Defendant Daya inquired regarding his medical problems and he answered her by going through the litany of his symptoms,

13

including coughing and dizziness, and he also told her about the incident at SCI-Forest.(Id.) James claims that Defendant Daya did not enter his cell or examine him but she observed his serious medical condition. (Id. at 29-30) James alleges that Defendant Daya stated that she did not know what was wrong with him but would order some tests. (Id.)  James then claims she left "him in physical pain, and at risk of death by depriving [him] of immediate medical treatment" and she failed to issue him his asthma inhaler. (Id. at 30.)  James further contends that the medical testing did not take place. (Id.)

James claims that at around 3:00 p.m. on October 12, 2012, Defendant Novalis and John Doe # 11 arrived at James's "cell to provide Plaintiff a shower." (Id. at 30.) James alleges that he reported his litany of symptoms to Defendant Novalis and John Doe #11 and that they could observe that he was in distress. (Id.) James contends that they took him to the shower area, that the heat and steam from the shower overpowered him and he nearly collapsed, and that the Defendant Novalis and John Doe #11 removed him from the shower and escorted him back to his cell. (Id. at 31.) James claims that Defendant Novalis and John Doe #11 failed to report his need for medical care. (Id.)

James alleges that on October 12, 2012, at about 5:30 p.m. Defendant Masser supervised the distribution of the evening meal and that James made Defendant Masser aware of his need for medical care. (Id.)  James claims he was unable to retrieve his

meal tray for the second day in a row because of his physical
condition and that he reported his need for medical care to
Defendant Masser who merely told him to sign up for sick call.
(Id. at 31-32.)   James claims he told Defendant Masser that he did
not have a sick call form to complete and that Defendant Masser
told him to obtain one from his Pod Officer who was Defendant
Baker.(Id. at 32.) James then appears to suggest that he was
unable to contact Defendant Baker and, therefore, requested a sick
call form from Defendant Kratz but Defendant Kratz refused to
provide James with the form and refused to notify the medical
department of his alleged need for medical care.(Id. at 33.)

James next alleges that on October 13, 2012, at around
7:00 a.m., his morning meal was delivered by Defendants Rodriguez
and Burrows.(Id.)   James claims that he told those two defendants
that he had not been able to eat and informed them of his litany
of symptoms but they did not take steps to have him provided with
medical care and left him suffering in pain and distress. (Id. at
34) James further claims that at about 8:30 a.m. he pressed his
emergency call button and when John Doe #12 responded James
reported his multiple medical symptoms and told John Doe #12 that
he was in need of immediate medical care. (Id.) John Doe #12
allegedly told James that he would "look into Plaintiff's
complaints."(Id. at 35.) James claims that after 135 minutes
passed, Defendant Krzykowski arrived at James's cell and found
James coughing, gasping and wheezing.(Id.)   James alleges he

15

repeated his litany of symptoms, but Defendant Krzykowski merely told James to sign up for sick call and left James in his cell suffering in pain. (Id.)

Over the next 4 days James alleges he was "dying" and deprived of access to medical care and that on October 17, 2012, Defendant Davis visited his cell to conduct an "asthma clinic" escorted by Defendant Burrows.(Id. at 36.) James informed Defendant Davis what had occurred at SCI-Forest and that he had been without his asthma inhaler and could not breathe. (Id.) James contends that he informed Defendant Davis that his heart was beating rapidly and he had chest pain.(Id.)  James states that Defendant Davis observed that he was coughing, gasping for air, wheezing and could not stand. (Id.) James requested that Defendant Davis provide him with his asthma inhaler and provide him medical care for his other symptoms. (Id.)  In response to that request, Defendant Davis allegedly stated that he was only there to conduct an asthma clinic and any other medical complaints would need to be addressed at sick call. (Id.)  James claims that Defendant Davis left without providing him with an asthma inhaler. (Id.)

James next claims that on October 18, 2012, at about 1:00 p.m., he was brought before the Program Review Committee ("PRC") at SCI-Coal Township and that Defendant Novalis and John Doe # 11 "had to physically drag and carry" him to the room where the PRC was meeting. (Id. at 36-37.)  James contends that after entering the room he was placed in a chair and that Defendant

16

Novalis and John Doe #11 had to hold him in the chair to prevent him from falling face first on the floor. (Id. at 37.)  James alleges that when the PRC observed his condition they asked him what was wrong but he was too weak to respond.  (Id.)  Defendant Masser informed the PRC that James had arrived at SCI-Coal Township already sick and stated that James had not been eating or drinking anything. (Id.)  James claims that the PRC then immediately released him from the RHU and directed that he receive medical attention. (Id.)  James alleges that he was "carried into the triage area within the restricted housing unit" and that an unknown nurse arrived who directed that he be taken to the infirmary. (Id.)  James states that he was taken to the infirmary in a wheel chair by Defendants Novalis, John Doe #11 and the unknown nurse. (Id.)

After arriving in the infirmary James claims it was determined that his pulse was over 200, he was immediately administered oxygen and an ambulance was called to have him transported to a local hospital. (Id.)  At the hospital, James alleges that he received "breathing treatment, blood testing" and the administration of "some kind of steroid and other medical procedures, before [he] was return[ed] on October 18, 2012, to SCI-Coal Township [where he] was admitted to the prison infirmary." (Id.)

James alleges that the delay in receiving medical care resulted in him being required to take medication to control his

17

heart rate and blood pressure which he "previously never needed." (Id. at 38.)  James claims that testing at the hospital revealed that he had an "overactive or hyperactive thyroid gland" which medical personnel at SCI-Coal Township began to treat after his return. (Id.)  James alleges that after returning from the hospital he was provided with his asthma inhaler as well as protein drinks to treat his weight loss of 75 pounds, having gone from 215 to 140 pounds. (Id.)  James claims he was treated in the infirmary for 5 days and was only released when his heart rate stabilized under 100 beats per minute, and upon his release from the infirmary he was placed in the Special Needs Housing Unit ("SNU") at SCI-Coal Township because he was "still suffering extreme difficult breathing, feeling extremely disorientated and . . . still extremely fragile from the [loss of weight.]" (Id.)

Sometime after his release from the infirmary and admission to the SNU, James claims he approached Defendants Mosier, Tripp and Else requesting assistance with identifying certain correctional officers who he encountered after he arrived at SCI-Coal Township on October 11, 2012. ( Id. at 38-39.)  James claims that he indicated he intended to file grievances and ultimately a civil complaint with respect to the excessive force to which he was subjected and the inadequate medical care. (Id. at 39.)  James further claims that he requested a transfer to another facility "so that [his] medical needs could appropriately be met without further threat or retaliation once [he] filed his inmate

18

grievance and lawsuit for the deprivation of his medical needs and excessive force claims." (Id.) James alleges that Mosier, Tripp and Else responded by stating that they would not assist him in identifying the correctional officers and medical personnel and that they would not initiate a request for separation from those correctional officers or a transfer to another facility. Id. James then claims that Defendants Mosier, Tripp and Else threatened him by "stating that Plaintiff better not file a complaint or lawsuit against staff making trouble" and Defendant Mosier specifically stated that "if Plaintiff was insistent about filing grievances Plaintiff's stay would be met with extreme hardship." (Id.)

James alleges that on November 7, 2012, after attempting to identify the correctional officers who were involved with him during the first few days after he arrived at SCI-Coal Township and failing to identify them, he filed a grievance, # 437413, regarding the infliction of excessive force and being denied adequate medical care. (Id.) James claims that nine days passed without receiving a response regarding the grievance but he observed Defendants Mosier, Tripp and Else sitting in Mosier's office located in the SNU "reading through and upon information and belief censoring several grievance[s] which were either filed or had been returned as they sat on Defendant[] Mosier[']s desk." (Id. at 40.) James contends that he approached Defendants Mosier, Tripp and Else and inquired as to the status of his grievance.

(Id.)  James alleges that he asked Defendants Mosier, Tripp and
Else whether they had filed his grievance or had they done
something to interfere with the grievance being adequately
processed which was a question James considered appropriate in
light of their refusal to help identify the responsible
correctional officers and the threat from Defendant Mosier that if
he filed a grievance his "stay at SCI-Coal Township would be met
with extreme hardship." (Id.)  James states that he informed
Defendants Mosier, Tripp and Else that if they interfered with the
processing of the grievance he would file a grievance against
them.(Id.)  James further alleges that he again asked for a
transfer to another institution and informed Defendants Mosier,
Tripp and Else that he observed in the institution an inmate
Martin who was to have no contact with him for security reasons.
(Id.)

James alleges that in response to his inquiry regarding
his grievance, Defendant Mosier asked James if he filed a
grievance against him because he would not identify the
correctional officers and medical staff who had contact with him
during the first few days at SCI-Dallas. (Id. at 41.)  Defendant
Mosier also allegedly stated that he didn't know anything about a
grievance and he was not going to "play" with him. Id.  James
claims Mosier also made a threat by stating he would fix it so
that inmate Martin would be in a cell with him and then stated in
the presence of Defendants Tripp and Else that we will then see if

you still have complaints after that encounter at which point
Mosier, Tripp and Else laughed and Defendant Else stated "an ass
whooping and a hole trip should straighten [James] out." (Id.)
Defendant Tripp then allegedly chimed in "we don't have time for
your non-sense down here" and that James was going to "conform
willingly or unwillingly and that if [James] didn't get in line
someone [would] beat [him] in line" allegedly referring to inmate
Martin. (Id.)  James claims that he took all of these statement as
"threats to cease, and discontinue [his] exercise of [his] First
Amendment Right to seek redress through grievance of
constitutional violations which [he] had suffered and [the]
threats were a way to intimidate [him] knowing that [he] had
already suffered abuses[.]" (Id.)

        Because of these threats James alleges that he wrote
several letters to state officials. (Id. at 42.)  On November 29,
2012, five days after sending some of those letter, James claims
that SCI-Coal Township was placed on lock down and cells were
searched. (Id.)  James claims he was removed from his cell while
it was searched and returned to it without incident after the
search. (Id.)  Shortly after that search when James was in his
cell cleaning up, James alleges that Defendant Mosier and Tripp
came to his cell door and "immediately began to threaten [him] and
verbally assault [him] stating that because [he] made his inmate
abuse complaint" notifying executive staff at the Department of
Corrections and other official, he was being sent to the RHU.(Id.

at 43.)  James further claims they stated "somebody is really going to [expletive] you up now" and "we tried to tell you that [you] would regret complaining around here now watch." (Id.) James claims that Defendants Mosier and Tripp then walked away and just moments after that encounter eight correctional officers came to James's cell and ordered him to assume the position in order to be placed in restraints because he was being taken to the RHU on orders from Defendants Mosier and Tripp.  (Id.)  James then alleges that Defendants Mosier and Tripp filed a false misconduct report against him in which they accused him of threatening an employee or their family bodily harm, threatening another person and using abusive or inappropriate language to an employee. (Id. at 44.)

On December 4, 2012, James alleges that he had a hearing before a hearing examiner at which he introduced his version of the events and submitted the correspondence which he forwarded to state officials shortly before he was charged by Defendants Mosier and Tripp.(Id. at 44-45.)  James claims that at the hearing he argued that the misconduct charges were in retaliation for his submitting to state officials the letters regarding the excessive use of force and inadequate medical care he received. (Id. at 45.) James indicates that the hearing examiner found him guilty of the misconduct charges and sentence him to 120 days of disciplinary confinement. (Id.)  James alleges that he exhausted his administrative remedies with respect to the misconduct charges

when the Chief Hearing Examiner affirmed the decision and sanctions imposed.(Id.)

James next alleges that Defendant Varano, the Superintendent at SCI-Coal Township, was involved in the building expansion at SCI-Coal Township which resulted in an increase in the inmate population. (Id.)  James contends that when the prison was expanded there was an insufficient expansion of the infirmary to meet the needs of all of the inmates. (Id.)  James claims that the Superintendent at SCI-Coal Township instituted a practice or policy of not housing RHU inmates with medical needs in the infirmary or transferring them to other facilities to receive treatment but in psychiatric observation cells. (Id. at 46.) James contends that this policy or practice was instituted to save money and appears to contend Defendant McCarthy and the other individual defendants enforced and implemented the policy and that he was placed in such a cell and as a result received inadequate medical care. (Id.)

IV.     **Discussion**

Construing the amended complaint liberally as we must do, James contends that the named individual defendants and John and Jane Does violated his rights under the Eighth Amendment to receive adequate medical care and be free from the use of excessive and unnecessary force. Encompassed with the Eighth Amendment claim is a claim relating to James's conditions of confinement. Specifically, he claims that the medical facilities

at SCI-Coal Township were inadequate to provide him with proper medical care and that the deficiency contributed to the alleged harm he suffered. Moreover, as part of the conditions of confinement claim, James asserts that he was denied adequate food and nutrition. James also claims that the named individual defendants and John and Jane Doe defendants denied him equal protection under the Fourteenth Amendment. James further claims that Defendants Mosier, Trip and Else verbally harassed him and violated his rights under the First Amendment by retaliating against him for filing grievances and submitting letters to state officials regarding the excessive use of force and inadequate medical care. Finally, James contends that the defendants conspired to violate his constitutional rights. In addressing the two outstanding motions to dismiss, the court will initially set forth the applicable legal principles.

A.   **Section 1983, Personal Involvement and Supervisory Liability**

To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. See 42 U.S.C. § 1983; see also West v. Atkins, 487 U.S. 42, 48 (1988). A prerequisite for a viable civil rights claim is that the defendant directed, or knew of and acquiesced in, the deprivation of the plaintiff's constitutional rights. See Monell

v. Dep't of Social Serv., 436 U.S. 658, 694-95 (1978); Gay v.
Petsock, 917 F.2d 768, 771 (3d Cir. 1990); Rode v. Dellarciprete,
845 F.2d 1195, 1207-08 (3d Cir. 1988).  The plaintiff must allege
that the defendant was personally involved in the events or
occurrences that underlie the claim.  See Atkinson v. Taylor, 316
F.3d 257, 270-71 (3d Cir. 2003).

Liability may not be imposed under § 1983 on the
traditional standards of respondeat superior.  Capone v.
Marinelli, 868 F.2d 102, 106 (3d Cir. 1989) (citing Hampton v.
Holmesburg Prison Officials, 546 F.2d 1017, 1082 (3d Cir. 1976)).
In Capone, the court noted "that supervisory personnel are only
liable for the § 1983 violations of their subordinates if they
knew of, participated in or acquiesced in such conduct."  868 F.2d
at 106 n.7.

There are only two avenues for supervisory liability.
First, as mentioned above, if the supervisor knew of, participated
in or acquiesced in the harmful conduct, and second, if a
supervisor established and maintained a policy, custom or practice
which directly caused the constitutional harm.  Id.; Santiago v.
Warminster Township, 629 F.3d 121, 129 (3d Cir. 2010); A.M. ex
rel. J.M.K. v. Luzerne County Juvenile Center, 372 F.3d 572, 586
(3d Cir. 2004).  However, with respect to the second avenue of
liability, conclusory, vague and speculative allegations of a
custom, policy or practice are insufficient under Twombly and
Iqbal.  Id.

B.    **Eighth Amendment**

There are several types of Eighth Amendment claims, including a claim of inadequate or denial of medical care, exposure to adverse conditions of confinement, and the use of excessive force by prison guards.  However, each type of claim has two basic components: an objective and a subjective component. Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. Id.  The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind." Id.

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). In order to establish a claim under § 1983 based on the Eighth Amendment, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).  The relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) plaintiff's serious medical needs (the objective element). Farmer v.  Brennan, 511 U.S. 825 (1994); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West v. Keve, 571

F.2d 158, 161 (3d Cir. 1979).  Because only egregious acts or omissions can violate this standard, mere medical malpractice can not result in an Eighth Amendment violation, nor can disagreements over a prison physician's medical judgment.  White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." Estelle v. Gamble, 429 U.S. 97, 106, (1976). "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice." Id., 429 U.S. at 107.  "Allegations of medical malpractice are not sufficient to establish a Constitutional violation." Spruill, 372 F.3d at 235.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).  In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and

27

unusual punishment.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996).  The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency.  Hudson v. McMillian, 503 U.S. 1 (1992).  A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 347; Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981); West vs. Keve, 571 F.2d at 162-63 n.6.  The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.  See Monmouth

28

County Correctional Institution Inmates v. Lanzaro, 834 F.2d at
347; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); Todaro
v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).  The Court of Appeals for
the Third Circuit has held that not every injury or illness enjoys
constitutional protection; only serious medical problems are
actionable.  See West v. Keve, 571 F.2d at 161.  In fact courts
have indicated that minor abrasions, even involving associated
bleeding, do not rise to the level of an objectively serious
medical need. See Wisneski v. Denning, 2014 WL 1758118, *22
(W.D.Pa. April 30, 2014) and cases cited therein.

       As for an Eighth Amendment condition-of-confinement
claim, the deliberate indifference standard is, "extreme
deprivations are required to make out a conditions-of-confinement
claim." Hudson, 503 U.S. at 9.  Part of the penalty facing those
who violate the norms of society is routine discomfort.  Id.;
Rhodes v. Chapman, 452 U.S. 337, 346 (1981).  The Eighth Amendment
does not require that inmates be provided with comfortable
prisons.  Rhodes, 452 U.S. at 349; Loe v. Wilkinson, 604 F. Supp.
130, 133-34 (M.D. Pa. 1984).  To determine whether conditions of
confinement are in violation of the Eighth Amendment, a court must
look at the totality of the circumstances.  Tillery v. Owens, 907
F.2d 418, 426 (3d Cir. 1990). In Farmer, the Supreme Court
described the standard for determining deliberate indifference
with respect to conditions of confinement as follows:

          [A] prison official cannot be found liable under
          the Eighth Amendment for denying an inmate humane

                            29

>conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837.  The Court added that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." Id. at 842.

In the context of an excessive force claim,  although prisoners are protected from cruel and unusual punishment by the Eighth Amendment, not all tortious conduct which occurs in prison rises to the level of an Eighth Amendment violation.  See Howell v. Cataldi, 464 F.2d 272, 277 (3d Cir. 1972) (Not all tortious conduct redressable under state law constitutes cruel and unusual punishment).  "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973).  If a correctional officer uses physical force in pursuit of valid penological or institutional goals, then the force used will rarely, if ever, violate the Eighth Amendment.  See Whitley v. Albers, 475 U.S. 312 (1986); Rhodes, 452 U.S. at 346.

In order to constitute cruel and unusual punishment, the correctional officer's use of force must involve the "unnecessary and wanton infliction of pain." Whitley, 475 U.S. at 319.  "Wanton" has been defined as requiring that the correctional

officer has intended to harm the inmate.  <u>Sampley v. Ruettgers</u>, 704 F.2d 491, 495 (10th Cir. 1983).  "Unnecessary" has been held to require that the force used exceed that which appeared reasonably necessary to maintain or restore discipline at the time of the use of force. <u>Id.</u>  Finally, "pain" requires more than momentary discomfort; the attack must have resulted in either severe pain or a lasting injury. <u>Id.</u>

However, the United States Supreme Court in a later ruling recognized that the use of force may constitute cruel and unusual punishment even if the prisoner does not sustain serious physical injuries.  <u>Hudson</u>, 503 U.S. at 4.  The Court added that the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. <u>Id.</u> at 6.

A court must look to a number of factors to determine whether the corrections officer, through his conduct, has "crossed the constitutional line." <u>Johnson</u>, 481 F.2d at 1033.  In <u>Whitley</u>, the Supreme Court, relying on <u>Johnson</u>, listed the following factors which a court should consider:  (1) the need for application of force; (2) the relationship between the need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any attempts made to temper the severity of the forceful response.  <u>Whitley</u>, 475 U.S. at 321.

31

It must also be kept in mind that a correctional officer, to maintain control of inmates, must often make instantaneous, on-the-spot decisions concerning the need to apply force.  See Wolff v. McDonnell, 418 U.S. 539, 566-67 (1974). Courts should be hesitant "to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance."  Whitley, 475 U.S. at 320.

### C.    Equal Protection

The Fourteenth Amendment of the Constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Court of Appeals for the Third Circuit has observed that the equal protection clause "is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'"  Artway v. Attorney General, 81 F.3d 1235, 1267 (3d Cir. 1996)(quoting City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985)); see also Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)("An equal protection claim arises when an individual contends that he or she is receiving different treatment from that received by other individuals similarly situated.").

It is well-settled that a litigant in order to establish a viable equal protection violation must show an intentional or purposeful discrimination. Snowden v. Hughes, 321 U.S. 1, 8

32

(1944); <u>Wilson v. Schillinger</u>, 761 F.2d 921, 929 (3d Cir. 1985),

<u>cert</u> <u>denied</u>, 475 U.S. 1096 (1986); <u>E & T Realty v. Strickland</u>, 830

F.2d 1107, 1113-14 (11th Cir. 1987), <u>cert. denied</u>, 485 U.S. 961

(1988).  This "state of mind" requirement applies equally to

claims involving (1) discrimination on the basis of race,

religion, gender, alienage or national origin, (2) the violation

of fundamental rights and (3) classifications based on social or

economic factors.  <u>See, e.g.</u>, <u>Britton v. City of Erie</u>, 933 F.

Supp. 1261, 1266 (W.D. Pa. 1995), <u>aff'd</u>, 100 F.3d 946 (3d Cir.

1996); <u>Adams v. McAllister</u>, 798 F. Supp. 242, 245 (M.D. Pa.),

<u>aff'd</u>, 972 F2d 1330 (3d Cir. 1992).[3]

### D.  Retaliation

To allege a Section 1983 retaliation claim under the

First Amendment, a plaintiff must aver facts that, if proven,

would establish three elements.  First, a plaintiff must allege

facts indicating that he was engaged in a constitutionally

protected activity.  <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (2001).

Second, a prisoner must allege facts indicating that he "suffered

some 'adverse action' at the hands of prison officials."  <u>Id.</u>

(quoting  <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000)).

This requirement is satisfied by alleging facts indicating that

"the action 'was sufficient to deter a person of ordinary firmness

from exercising his First Amendment rights.'"  <u>Id.</u> (quoting <u>Allah</u>,

---

3.  However, when a statute, rule or regulation "discriminates on
its face," there is no need to present any further evidence of
intent.  <u>See</u> <u>E & T Realty</u>, 830 F.2d at 1112 n.5.

229 F.3d at 225). Third, a prisoner must allege facts indicating that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him" or take the adverse action  Id. (quoting Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); see also Bonaparte v. Beck, 374 F. App'x 351, 353-354 (3d Cir. 2010)(pro se inmate's allegation that he filed a grievance requesting work transfer because his supervisor was disrespectful when communicating with him and that supervisor retaliated by filing a false incident report against him was sufficient to allege constitutionally protected conduct and adverse action by correctional facility official).[4]

It is well established that the filing a false misconduct report is cognizable as a violation of the First Amendment when the false misconduct charge is filed for the purpose of retaliating against an inmate for his or her exercise of a constitutional right such as his or her right to file a grievance with state officials or a lawsuit regarding prison conditions.  Smith v. Messinger, 293 F.3d 641, 653-654 (3d Cir. 2002); see also Robinson v. Folino,___ F. App'x ___, 2016 WL 336063, at *2-3 (3d Cir. Jan. 28, 2016)(allegation by state

---

[4]  The burden shifting analysis of Mount Healthy is not applicable until the summary judgment or trial stage. See Robinson v. Folino,____F. App'x ___, 2016 WL 336063, at *3 (3d Cir. Jan. 28, 2016); Bond v. Horne, 553 F. App'x 219, 223-224 (3d Cir. 2014).

34

prisoner that prison guard retaliated against him for filing a prison grievance by filing a misconduct charge against him, which resulted in a disciplinary finding against the prisoner and his transfer to the restricted housing unit stated a claim against guard for First Amendment retaliation).

### E.  Verbal Harassment

Verbal harassment is generally not actionable under § 1983. Johnson, 481 F.2d at 1033 n.7; Maclean v. Secor, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995); Murray v. Woodburn, 809 F. Supp. 383, 384 (E.D. Pa. 1993) ("Mean harassment . . . is insufficient to state a constitutional deprivation."); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 189 (D.N.J. 1993) ("[V]erbal harassment does not give rise to a constitutional violation enforceable under § 1983."). Mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.  Fisher v. Woodson, 373 F. Supp. 970, 973 (E.D. Va. 1973); see also Balliet v. Whitmire, 626 F. Supp. 219, 228-29 (M.D. Pa.) ("[v]erbal abuse is not a civil rights violation . . ."), aff'd, 800 F.2d 1130 (3d Cir. 1986) (Mem.).  A constitutional claim based only on verbal threats will fail regardless of whether it is asserted under the Eighth Amendment's cruel and unusual punishment clause, see Prisoners' Legal Ass'n, 822 F. Supp. at 189, or under the Fifth Amendment's substantive due process clause, see Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991).

Verbal harassment or threats, with some reinforcing act accompanying them, however, may state a constitutional claim. For example, a viable claim has been found if some action taken by the defendant escalated the threat beyond mere words. See Northington v. Jackson, 973 F.2d 1518 (10th Cir. 1992) (guard put a revolver to the inmate's head and threatened to shoot); Douglas v. Marino, 684 F. Supp. 395 (D.N.J. 1988) (involving a prison employee who threatened an inmate with a knife). It has also been found that verbal harassment can rise to a constitutional level in a situation where fulfillment of the threat was conditioned on the inmate's exercising some constitutionally protected right. Bieros v. Nicola, 860 F. Supp. 226, 233 (E.D. Pa. 1994); see also Prisoners' Legal Ass'n, 822 F. Supp at 189; Murray, 809 F. Supp. at 384.

### F.  Conspiracy

In order to set forth a cognizable conspiracy claim, a plaintiff cannot rely on broad or conclusory allegations. D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1377 (3d Cir. 1992) cert. denied, 506 U.S. 1079 (1993); Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989); Durre v. Dempsey, 869 F.2d 543, 545 (10th Cir. 1989). The United States Court of Appeals for the Third Circuit has further noted that "[a] conspiracy claim must . . . contain supportive factual allegations." Rose, 871 F.2d at 366. Moreover, "[t]o plead conspiracy adequately, a plaintiff must set forth allegations that

address the period of the conspiracy, the object of the
conspiracy, and the certain actions of the alleged conspirators
taken to achieve that purpose." <u>Shearin v. E.F. Hutton Group,
Inc.</u>, 885 F.2d 1162, 1166 (3d Cir. 1989).

 The essence of a conspiracy is an agreement or concerted
action between individuals. <u>See</u> <u>D.R. by L.R.</u>, 972 F.2d at 1377;
<u>Durre</u>, 869 F.2d at 545.  Consequently, a plaintiff must allege
with particularity and present material facts which show that the
purported conspirators reached some understanding or agreement or
plotted, planned and conspired together to deprive plaintiff of a
protected federal right.  <u>Id.</u>; <u>Rose</u>, 871 F.2d at 366; <u>Young</u>, 926
F.2d at 1405 n.16; <u>Chicarelli v. Plymouth Garden Apartments</u>, 551
F. Supp. 532, 539 (E.D. Pa. 1982).  Where a civil rights
conspiracy is alleged there must be some specific facts in the
complaint which tend to show a meeting of the minds and some type
of concerted activity.  <u>Deck v. Leftridge</u>, 771 F.2d 1168, 1170
(8th Cir. 1985).  A plaintiff cannot rely on subjective suspicions
and unsupported speculation.  <u>Young v. Kann</u>, 926 F2d 1396, 1405
n.16 (3d Cir. 1991).

### G.  Medical Defendants' Motion to Dismiss

 As stated earlier the defendants are divided into two
groups: the Medical Defendants and Corrections Defendants.  The
claims against the Medical Defendants, Davis and Daya, are under
the Eighth Amendment and the Fourteenth Amendment.  The Eighth
Amendment claim against the Medical Defendants relates to the

37

alleged inadequate medical care provided to James by them.  James further appears to claim that they denied him equal protection and conspired with the other defendants to deny him medical care.  He also appears to claim that they are somehow responsible for the inadequate medical facilities at SCI-Coal Township.

The Medical Defendants, Brian Davis and Jennifer Daya, argue that the amended complaint should be dismissed as it relates to them because James (1) failed to exhaust his administrative remedies and (2) fails to state a claim of deliberate indifference to his medical needs and his conditions of confinement, a viable equal protection claim, or a cognizable conspiracy claim.

With respect to the Medical Defendants claim that James failed to exhaust his administrative remedies, James in his brief in opposition does not specifically respond to that argument but filed exhibits (Doc. No. 41, at 16-25) which reveal that he exhausted his administrative remedies with respect to Grievance # 437413, the same grievance he alleges in the amended complaint that he filed on November 7, 2012.  Although the grievance does not specify by name Defendants Daya and Davis, James alleged in the amended complaint that he filed the grievance after unsuccessfully attempting to obtain the names of the responsible medical personnel from Defendants Mosier, Tripp and Else. Moreover, the grievance refers to both a male and female physician assistant who failed to provide him with medical care. (Id.)  The grievance was denied at the three levels of the administrative

process: (1) a written grievance to the facilities Grievance Coordinator, (2) review by the Facility Manager (Superintendent) and (3) review by the Secretary's Office of Inmate Grievances and Appeals.[5] (Id.)  The final step of the administrative process occurred on March 27, 2013, when the Chief Grievance Officer, Dorina Varner, denied the administrative appeal and upheld the decision of David A. Varano, the Superintendent of SCI-Coal Township. (Id. at 21, 25.) Consequently, the Medical Defendants' claim that James failed to exhaust administrative remedies is devoid of merit.

As for the Eighth Amendment claims, based on the legal standards applicable to Eighth Amendment claims and the facts alleged in the amended complaint the court concludes that James has sufficiently set forth a claim of deliberate indifference to a serious medical need.[6]  The complaint alleges that James informed both Defendant Daya and Davis of his medical distress and what occurred at SCI-Forest, including receiving 10-bags of intravenous fluid, that they observed his condition, declined to examine him, and failed to provide or delayed the provision of medical care to

---

5.  See Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 2000)(outlining Pennsylvania's grievance review process).

6.  To the extent that James claims that Defendants Daya and Davis are somehow responsible for the alleged inadequacy of the medical facilities at SCI-Coal Township and is pursuing a conditions-of-confinement claim against them based on that inadequacy, the court agrees with Defendants Daya and Davis that as contracted medical providers such a claim against them is not cognizable.

him ultimately resulting in his transport to a local hospital for treatment. Plaintiff alleges that the denial of and delay in receiving medical care caused him pain and exacerbated his medical condition. Under the standards applicable to motions to dismiss, the Eighth Amendment claims against Defendants Daya and Davis are cognizable.

However, James has failed to allege facts from which it can be concluded that Defendants Daya and Davis engaged in intentional or purposeful discrimination or that he was treated differently than similarly situated individuals on the basis of his race or some other impermissible reason. Consequently, his equal protection claims against Defendants Daya and Davis will be dismissed.

Likewise, viewing the amended complaint in the light most favorable to James, it is clear that James has failed to state a viable conspiracy claim against Defendants Daya and Davis. There are no averments of fact in the amended complaint that reasonably suggest the presence of an agreement or concerted activity between Defendants Daya and Davis or the other defendants to violate James civil rights.

## H.  Corrections Defendants' Motion to Dismiss

Plaintiff also claims that the Corrections Defendants violates his rights under the Eighth Amendment and the Fourteenth Amendment, and that Defendants Mosier, Tripp and Else retaliated against him in violation of his First Amendment rights.  The

Corrections Defendants argue: (1) the claims against the Corrections Defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; (2) James's claims based on verbal harassment should be dismissed for failure to state a claim; (3) James's equal protection claim should be dismissed because he has failed to allege intentional discrimination; (4) James's conspiracy claim against the Corrections Defendants should be dismissed because that claim is conclusory and speculative and he fails to state a First Amendment retaliation claim; (5) James's claim regarding the denial of food and adequate medical care should be dismissed because he fails to establish a sufficiently serious deprivation or that the Corrections Defendants acted with deliberate indifference to any serious risk of harm; and (6) James's claims against Corrections Defendants Varano and McCarthy should be dismissed for failure to allege sufficient personal involvement.  The court will address those argument in that order.

First, with regard to the official capacity claims, James dropped those claims when he filed the amended complaint. Consequently, the argument is moot.

Second, as for the Corrections Defendants' concern about a verbal harassment claim, the court does not construe James's amended complaint as asserting a mere verbal harassment claim and if he did such a claim would fail. <u>Johnson</u>, 481 F.2d at 1033 n.7 (mere verbal harassment is not actionable under § 1983); <u>Maclean</u>

41

<u>v. Secor</u>, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995); <u>Murray v.</u>
<u>Woodburn</u>, 809 F. Supp. 383, 384 (E.D. Pa. 1993) ("Mean harassment
. . . is insufficient to state a constitutional deprivation.");
<u>Prisoners' Legal Ass'n v. Roberson</u>, 822 F. Supp. 185, 189 (D.N.J.
1993) ("[V]erbal harassment does not give rise to a constitutional
violation enforceable under § 1983.").  Mere threatening language
and gestures of a custodial officer do not, even if true, amount
to constitutional violations.  <u>Fisher v. Woodson</u>, 373 F. Supp.
970, 973 (E.D. Va. 1973); <u>see also</u> <u>Balliet v. Whitmire</u>, 626 F.
Supp. 219, 228-29 (M.D. Pa.) ("[v]erbal abuse is not a civil
rights violation . . ."), aff'd, 800 F.2d 1130 (3d Cir. 1986)
(Mem.).  A constitutional claim based only on verbal threats will
fail regardless of whether it is asserted under the Eighth
Amendment's cruel and unusual punishment clause, <u>see</u> <u>Prisoners'</u>
<u>Legal Ass'n</u>, 822 F. Supp. at 189, or under the Fifth Amendment's
substantive due process clause, <u>see</u> <u>Pittsley v. Warish</u>, 927 F.2d
3, 7 (1st Cir. 1991).

        However, verbal harassment or threats, with some
reinforcing act accompanying them may state a constitutional
claim.  For example, a viable claim has been found if some action
taken by the defendant escalated the threat beyond mere words.
<u>See</u> <u>Northington v. Jackson</u>, 973 F.2d 1518 (10th Cir. 1992) (guard
put a revolver to the inmate's head and threatened to shoot);
<u>Douglas v. Marino</u>, 684 F. Supp. 395 (D.N.J. 1988) (involving a
prison employee who threatened an inmate with a knife).  It has

also been found that verbal harassment can rise to a
constitutional level in a situation where fulfillment of the
threat was conditioned on the inmate's exercising some
constitutionally protected right.  Bieros v. Nicola, 860 F. Supp.
226, 233 (E.D. Pa. 1994); see also Prisoners' Legal Ass'n, 822 F.
Supp at 189; Murray, 809 F. Supp. at 384.  Applying this law to
the facts alleged in the amended complaint, the verbal harassment
claims against the Corrections Defendants fail to state a claim
except for Defendants Mosier, Tripp and Else.  It is alleged that
those three defendants made several statements that James would
suffer harm if he filed a grievance or pursued a civil action
regarding excessive force or the medical treatment he received.
Consequently, the verbal harassment claims will be dismissed
except for those asserted against Mosier, Tripp and Else.

Third, James's equal protection claim asserted against
the Corrections Defendants fails for the same reason the equal
protection claim asserted against the Medical Defendants failed.
James has failed to allege intentional or purposeful
discrimination or that he was treated differently than similarly
situated individuals on the basis of his race or some other
impermissible reason.  Consequently, James's equal protection
claim against the Corrections Defendants will be dismissed.

Fourth, a review of the facts alleged in the amended
complaint reveal that James's conspiracy claim is not viable other
than with respect to Defendants Mosier, Tripp and Else.  To recap

those facts, James claims Mosier threatened him by stating he
would fix it so that inmate Martin would be in a cell with him and
then stated in the presence of Defendants Tripp and Else that we
will then see if you still have complaints after that encounter.
At that point, Defendants Mosier, Tripp and Else laughed and
Defendant Else indicated "an ass whooping and a hole trip" would
straighten out James. Defendant Tripp then allegedly chimed in
that James was going to "conform willingly or unwillingly" and if
James failed to do so he would be beaten into line.  James then
alleges that his cell was searched after he sent correspondence to
state officials. Shortly after that search, Defendant Mosier and
Tripp came to his cell door and began to threaten him and that
because he submitted those letters he would be taken to the RHU.
Subsequently, James alleges that he was charged with a misconduct
by Mosier and Tripp. James also alleges that he observed Mosier,
Tripp and Else together in Mosier's office reviewing grievances.
These facts appear to be sufficient to set forth a claim that
Mosier, Tripp and Else conspired to retaliate against James for
exercising his First Amendment rights.  The conspiracy claims
against the Corrections Defendants will be dismissed other than
those asserted against Mosier, Tripp and Else.  Likewise, the
underlying First Amendment retaliation claim will be dismissed
against the Corrections Defendants, except for the claims asserted
against Mosier, Tripp and Else.  James sufficiently alleges in the
amended complaint that he was engaged in a constitutionally

44

protected activity, he suffered adverse action, and his constitutionally protected activity of contacting state official and filing a grievances was a substantial or motivating factor in the decision of Mosier, Tripp and Else to discipline him.

Fifth, James contends that he was denied food in violation of his rights under the Eighth Amendment.  This claim appears to be part of his denial of medical care claim.  James contends that because of his medical condition he was unable to eat and the Corrections Defendants, in addition to failing to provide him medical care, also failed to take steps to make sure he had adequate nutrition.  Based on the legal standards applicable to Eighth Amendment claims and the facts alleged in the amended complaint, the court concludes that James has sufficiently set forth a claim against the Corrections Defendants of deliberate indifference to a serious medical need and his need for adequate nutrition.  James has alleged that he repeatedly advised the Corrections Defendants, except for Varano and McCarthy, that he had not eaten anything for several days.  He also advised them of his medical distress and what occurred at SCI-Forest, including that he received 10-bags of intravenous fluid and that, although his condition was observed, no one took steps to make sure he was examined or treated.  This alleged delay or failure to provide medical care ultimately resulted in his transport to a local hospital for treatment. The denial of medical care and the delay allegedly caused him pain and exacerbated his medical condition.

45

Under the standards applicable to motions to dismiss, the Eighth Amendment claims against the Corrections Defendants, except for Varano and McCarthy as explained below, are cognizable.

Finally, liability for an Eighth Amendment violation cannot be based on respondeat superior.  Supervisory personnel, such as Defendants Varano and McCarthy, can only be held liable if they knew of and acquiesced in the conduct or instituted a custom, policy or practice which was responsible for the harm. Although James contends that Varano and McCarthy instituted a policy of having inmates housed in psychiatric observation cells, there are no allegations from which it can be concluded that this policy was responsible for the harm he suffered. Based on the allegations, the harm was caused by the other individual defendants ignoring his pleas for medical care.  James's allegations of supervisory liability based on a custom, policy, or practice are vague, conclusory, and speculative and insufficient under Twombly and Iqbal.  Consequently, the claims against Defendants Varano and McCarthy will be dismissed.

An appropriate order will be entered.

---