**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PARIS L. JAMES,** | : | |
| **Plaintiff,** | : | |
| | : | **No. 1:14-cv-01951** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **DAVID VARANO, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

## I.    BACKGROUND

Pro se Plaintiff Paris L. James ("James"), initiated the above-captioned action on October 8, 2014 by filing a complaint pursuant to 42 U.S.C. § 1983 against numerous employees of the Department of Corrections ("DOC"), at the State Correctional Institution at Coal Township, Pennsylvania ("SCI-Coal Township").[1]  (Doc. No. 1.)  On March 23, 2015, James filed an amended complaint.  (Doc. No. 28.)  James claims that he was denied adequate medical care, subjected to substandard conditions of confinement, subjected to excessive force, and retaliated against for complaining about the quality of his medical treatment, the conditions of his confinement, and the excessive force inflicted upon him.  (Id.)  James further alleges that the Medical Defendants failed to provide him with adequate medical treatment for breathing difficulties.  (Id.)  He also claims that the Medical Defendants conspired with other Defendants to deprive Restricted Housing Unit ("RHU"), inmates of proper intake examinations and access to healthcare, and intentionally refused them medical care in order to reduce transportation costs from the RHU.  (Id.)

---

[1] Defendants include two groups: the "Medical Defendants," which include Physician Assistants Brian Davis ("Davis"), and Jennifer Daya ("Daya"); and the "Corrections Defendants," which include Mains, Schmerfeld, Alleman, Romedy, Segedy, Masser, Baker, Schoch, Krzykowski, Rodriguez, Burrows, Novailis, Kratz, Hyde, Goodwin, Mosier, Tripp, and Else.

Subsequently, all Defendants filed motions to dismiss the amended complaint. (Doc. Nos. 30, 31.) By Memorandum and Order dated August 31, 2016, the Court granted in part and denied in part Defendants' motions to dismiss. (Doc. Nos. 55, 56.) The Court dismissed James' conspiracy claims, equal protection claims, and claims as to the condition of confinement, but permitted the Eighth Amendment claims of deliberate indifference to a serious medical need to proceed. (Id.) The Court also dismissed James' verbal harassment, retaliation, and conspiracy claims, with the exception of those pertaining to Defendants Mosier, Tripp, and Else, and dismissed James' condition of confinement claim, as well as the medical care claims asserted against Defendants Varano and McCarthy on the basis of lack of personal involvement. (Id.) Accordingly, the remaining claims against the Correction Defendants are a claim for deliberate indifference to a serious medical need against Mains, Schmerfeld, Alleman, Remedy, Segedy, Masser, Baker, Schoch, Krzykowski, Rodriguez, Burrows, Novailis, Kratz, Hyde, and Goodwin and a claim based on retaliation, verbal harassment, and conspiracy against Moser, Tripp, and Else. The remaining claim against the Medical Defendants pertains to a deliberate indifference to a serious medical need.

After the close of discovery, the Medical Defendants and the Corrections Defendants filed motions for summary judgment (Doc. Nos. 103, 113), along with statements of material facts (Doc. Nos. 104, 115), and supporting briefs (Doc. Nos. 105, 114). In response to the Medical Defendants' summary judgment filings, James filed a motion in opposition (Doc. No. 110), declaration in opposition (Doc. No. 110-1), and counterstatement of material facts (Doc. No. 111). The Medical Defendants filed a reply brief (Doc. No. 117), to which James filed an unauthorized sur-reply brief (Doc. No. 123), which was stricken from the record in the Court's December 12, 2017 Order (Doc. No. 131).

In response to the Corrections Defendants' summary judgment filings, James filed a motion in opposition (Doc. No. 118), a counterstatement of material facts (Doc. No. 119), and a brief in support of his counterstatement of facts (Doc. No. 120). The Corrections Defendants subsequently filed a reply brief (Doc. No. 128), to which James filed an authorized sur-reply (Doc. No. 132), and also an "amended response in opposition" to the Corrections Defendants' statement of material facts (Doc. No. 133). The Corrections Defendants then filed a reply brief to James' amended response. (Doc. No. 134.) On January 22, 2018, James filed a motion to appoint counsel (Doc. No. 135), and a motion to file a limited sur-reply brief to the Corrections Defendants' reply brief (Doc. No. 138). Presently, the Medical and Corrections Defendants' motions for summary judgment, and James' motion to appoint counsel and motion to file a limited sure-reply brief are ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 862 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must

comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant. These rules apply with equal force to all parties. See Sanders v. Beard, Civ. No. 09-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (stating that pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, Civ. No. 02-01854, 2006 U.S. Dist. LEXIS 64347, at *11 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties must follow the Federal Rules of Civil Procedure).

## III. DISCUSSION

### A. James' Motion to File a Limited Sur-Reply Brief

James requests permission to file a second sur-reply brief to the Corrections Defendants' reply brief to address a limited argument raised by the Corrections Defendants pertaining to the retaliation claim against Defendants Moser, Tripp, and Else. (Doc. No. 138 at 1.) The decision to "grant or deny leave to file a sur[-]reply is committed to the sound discretion of the court." Akers v. Beal Bank, 760 F. Supp. 2d 1 (D.D.C. 2011). Here, Corrections Defendants' motion for summary judgment has already been fully briefed by both parties, and the Court has already permitted sur-reply briefs to be filed. The issue which James seeks to address has already been fully addressed. Accordingly, in the Court's sound exercise of discretion, it will deny James' motion to file a limited sur-reply brief.

### B. The Medical Defendants' Motion for Summary Judgment

### 1. Allegations Set Forth in the Amended Complaint

James' allegations against the Medical Defendants pertain to events beginning with his transfer to SCI-Coal Township from SCI-Forest on October 11, 2012. (Doc. No. 28 at 7, 22.) James alleges that he was seen by Physician Assistant Daya on October 12, 2012, and informed Daya that prior to his arrival at SCI-Coal Township, he received 10-bags of intravenous fluid at SCI-Forest. (Id. ¶ 157.) James complained to Daya that he is asthmatic, had been unable to eat or drink food or fluids for multiple days, had a racing heart, and was losing a great deal of weight. (Id.) James alleges that while Daya ordered medical testing, she failed to order it "without delay," which prolonged the time spent waiting for the results, and that Daya took no other reasonable steps or action to provide him with medical treatment. (Id. ¶¶ 159, 161.)

James also alleges that on October 17, 2012, he was found on the floor of his cell by Physician Assistant Davis. (Id. ¶ 184.) James alleges that he informed Davis that he had been without his asthma inhaler and that he could not breathe. (Id.) He alleges that he requested that Davis provide him with his asthma inhaler and treat his heart, chest, and other medical symptoms. (Id. ¶ 185.) Additionally, James avers that Davis informed him that he was present only to conduct the "asthma clinic," and that any other medical complaints would need to be addressed through a sick-call. (Id. ¶ 186.)

On October 18, 2012, James alleges that he was brought before the Program Review Committee ("PRC"), to review his administrative custody status. (Id. ¶ 188.) James maintains that the members of the PRC recognized that he was in need of medical care, as he was so weak that he had to be seated in a chair and was incapable of speaking. (Id. ¶¶ 189, 190.) James alleges that the medical department was called and that he was taken to the hospital, where he received breathing treatment, blood testing, and steroids. (Id. ¶¶ 192 - 94.) James avers that

only after testing was performed at the hospital was it discovered that he was suffering from an overactive or hyperactive thyroid gland and was given an asthma inhaler upon returning to the prison.  (Id. ¶ 196.)  James claims that the Medical Defendants were deliberately indifferent to his serious medical needs.

## 2.    Statement of Undisputed Facts[2]

James was received at SCI-Coal Township from SCI-Forest on October 11, 2012.  (Doc. No. 104 ¶ 5.)  He was seen and examined by Daya on October 12, 2012.  (Id. ¶ 6.)  Daya reviewed James' medical records and ordered lab testing and further monitoring of his symptoms and conditions.  (Id. ¶¶ 7-10.)  On October 26, 2012, the lab performing James' testing issued a "Final Report" to Daya.  (Id. ¶ 11.)

---

[2] Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements.  Id.  Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  See id.  Unless otherwise noted, the factual background herein is taken from Defendants' Rule 56.1 statement of material facts. (Doc. No. 104.)  While James filed a response to the Medical Defendants' statement of material facts admitting a number of facts, James refers to his verified amended complaint to support those facts he opposes.  (Doc. No. 111.)  However, while a verified complaint may be treated as an affidavit in opposition to a motion for summary judgment, the allegations contained therein must be based on personal knowledge and this Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question."  Hammonds v. Collins, Civ. No. 12-236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing Brooks v. Am. Broad. Co., 999 F.2d 167, 172 (6th Cir. 1993)).  Accordingly, unless otherwise noted, the Court deems the facts set forth by Defendants to be undisputed.  See M.D. Pa. LR 56. 1; Fed. R. Civ. P. 56(e)(2); Bowman v. Mazur, Civ. No. 08-173J, 2010 WL 2606291, at *3 (W.D. Pa. Oct. 30, 2010) ("Plaintiff's responsive statement of material facts is insufficient to create a genuine issue of material fact because it failed to comply with Local Rule 56.1.").

On October 17, 2012, James was seen by Davis, who conducted an asthma chronic care clinic on him. (Id. ¶¶ 12-13.) Davis ordered an asthma inhaler for James, as well as a chest x-ray. (Id. ¶¶ 14-15.) Davis then reviewed the chest x-ray report on October 24, 2012. (Id. ¶ 16.)

### 3. James' Claim of Deliberate Indifference to a Serious Medical Need Under the Eighth Amendment

The Medical Defendants contend that they are entitled to summary judgment because James has neither demonstrated that he had a serious medical condition nor established that he was not provided with medical care in violation of the Eighth Amendment. (Doc. No. 105.) The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. Estelle v. Gamble, 429 U.S. 97, 104 (1976). In Estelle, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." Id. (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)); see also Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted) ("To violate the Cruel and Unusual Punishment Clause, a prison official must have a sufficiently culpable state of mind. . . . In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety.").

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). To establish an Eighth Amendment claim based on a prison's denial of medical care, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003). The relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) plaintiff's serious medical needs (the objective element). Farmer, 511 U.S. at

838-39; <u>Monmouth Cty. Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 346 (3d Cir. 1987); <u>West v. Keve</u>, 571 F.2d 158, 161 (3d Cir. 1979). Because only egregious acts or omissions can violate this standard, mere medical malpractice will not result in an Eighth Amendment violation. <u>White v. Napoleon</u>, 897 F.2d 103, 108-10 (3d Cir. 1990); <u>see</u> <u>also</u> <u>Estelle</u>, 429 U.S. at 106 (stating that a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." <u>Brown v. Borough of Chambersburg</u>, 903 F.2d 274, 278 (3d Cir. 1990).

The "deliberate indifference" prong requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837. Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. <u>See</u> <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 133 (3d Cir. 2001) (citing <u>Farmer</u>, 511 U.S. at 842). The Third Circuit has found deliberate indifference when a prison official knows of a prisoner's need for medical treatment and intentionally refuses to provide it, delays necessary medical treatment for a non-medical reason, or prevents a prisoner from receiving needed or recommended medical treatment. <u>Rouse</u>, 182 F.3d at 197.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment that the inmate receives does not support a claim of cruel and unusual punishment. <u>Farmer v. Carlson</u>, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); <u>see</u> <u>also</u> <u>McCracken v. Jones</u>, 562 F.2d 22, 24 (10th Cir. 1977); <u>Smart v. Villar</u>, 547 F.2d 112, 113 (10th Cir. 1976). Additionally, if there is a dispute over the adequacy of the received treatment, courts have

consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming Cty., 912 F. Supp. 809, 815 (M.D. Pa. 1996), aff'd, 101 F.3d 691 (3d Cir. 1996). The relevant question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether the treatment is what the plaintiff desires. Carlson, 685 F. Supp. at 1339.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, is rooted in contemporary standards of decency. Hudson v. McMillian, 503 U.S. 1 (1992). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Lanzaro, 834 F.2d at 347 (citing Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979), aff'd, 649 F.2d 860 (3d Cir. 1981)). A serious medical need contemplates a condition of urgency, or one that may produce death, degeneration, or extreme pain. See Lanzaro, 834 F.2d at 347; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977). The Third Circuit has held that not every injury or illness enjoys constitutional protection, and, therefore, only serious medical problems are actionable. See Keve, 571 F.2d at 161.

Even assuming that a serious medical need exists, there is no indication from the record that the Medical Defendants were deliberately indifferent to James' medical needs. The record establishes that James was seen by Daya on October 12, 2012, the day after he arrived at SCI-Coal Township. (Doc. No. 104 ¶¶ 5, 6.) Daya documented James' subjective complaints and consequently ordered him a blood test and monitoring. (Id. ¶¶ 9, 10.) James was also seen on October 17, 2012 by Davis, who performed an asthma chronic care clinic and ordered James an inhaler and a chest x-ray. (Id. ¶¶ 12-14.)

James argues that Daya should have ordered that his blood testing be "conducted without delay" so that the results would have been available sooner. (Doc. No. 110-1 at 4.) James also argues that Daya and Davis should have immediately issued him an inhaler based on his complaints because the Medical Defendants "knew or should have known [James] needed to assist his breathing." (Id.) James does not maintain that he failed to receive care for his condition, but rather, disagrees with the care he received. However, a mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment that the inmate receives does not support a claim of cruel and unusual punishment. Farmer, 685 F. Supp. at 1339. Moreover, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as] medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

The record does not establish that either Daya or Davis knew of James' need for medical treatment and intentionally refused to provide it, delayed necessary medical treatment for a non-medical reason, or prevented James from receiving needed or recommended medical treatment. Rouse, 182 F.3d at 197. Additionally, James' attempt to utilize his verified amended complaint to create issues of material fact based on his subjective characterization of events or legal conclusions is not sufficient to establish the existence of a genuine dispute of material fact. See Hammonds, 2016 WL 1621986, at *3. Consequently, because Plaintiff has failed to establish that the Medical Defendants were deliberately indifferent to his serious medical needs, the Medical Defendants' motion for summary judgment will be granted.

### C.     The Corrections Defendants' Motion for Summary Judgment

James' remaining claims against the Corrections Defendants include a claim for deliberate indifference to a serious medical need against Mains, Schmerfeld, Alleman, Romedy, Segedy, Masser, Baker, Schoch, Krzykowski, Rodriguez, Burrows, Novailis, Kratz, Hyde, and Goodwin, and a claim based on retaliation, verbal harassment, and conspiracy against Moser, Tripp, and Else. (Doc. Nos. 28, 55, 56.)

## 1. Statement of Material Facts[3]

On October 8, 2012, while incarcerated at SCI-Forest, James was seen with complaints of vomiting, loose stools, and general aching. (Doc. No. 115 ¶ 2.) James was diagnosed with dehydration and placed on IV fluids and a clear liquid diet. (Id. ¶¶ 3, 4.) Subsequently, James was transferred from SCI-Forest to SCI-Coal Township on October 11, 2012. (Id. ¶ 6.) Defendants Mains and Schmerfeld, employees of SCI-Frackville, were the transport officers from the route between SCI-Smithfield to SCI-Coal Township. (Id. ¶ 12.) Defendants Mains and Schmerfeld performed a visual assessment on James per DOC policy and deemed James

---

[3] As previously set forth by this Court, James has not complied with M.D. Pa. L.R. 56.1 in that he has failed to respond specifically to the numbered paragraphs in Defendants' statement of material facts. (Doc. Nos. 115, 119.) Rather, James filed his own statement of material facts without regard to that of the Corrections Defendants. (Doc. No. 119.) James subsequently filed an "amended response in opposition" to the Corrections Defendants' statement of material facts, and made further attempts to support his statements through citation to his verified amended complaint. (Doc. No. 133.) However, while a verified complaint may be treated as an affidavit in opposition to a motion for summary judgment, the allegations must be based on personal knowledge and this Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question." Hammonds, 2016 WL 1621986, at *3 (citing Brooks, 999 F.2d at 172). Accordingly, unless otherwise noted, the Court deems the facts set forth by the Corrections Defendants to be undisputed. See M.D. Pa. L.R. 56. 1; Fed. R. Civ. P. 56(e)(2); Bowman, 2010 WL 2606291, at *3 ("Plaintiff's responsive statement of material facts is insufficient to create a genuine issue of material fact because it failed to comply with Local Rule 56.1.").

medically fit for transport. (Id. ¶ 19.) James did not appear malnourished and did not complain of being ill prior to being placed on the transport van. (Id. ¶¶ 20, 21.)[4]

James arrived at SCI-Coal Township on October 11, 2012, at 15:15 hours. (Doc. No. 115 ¶ 28.) After James entered the intake processing reception area, he was placed in a holding cell and his leg irons and handcuffs were removed by the transport officer. (Id. ¶¶ 32-34.) Defendants Romig and Segedy were on duty in the intake area at the time. (Id. ¶ 35.) James did not inform either Defendant that he needed medical care, was experiencing difficulty breathing, chest pains, dizziness, or fatigue, or that he is an asthmatic and required an inhaler. (Id. ¶¶ 36, 37.)[5]

The practice at SCI-Coal Township is that the inmates transported there who are to be housed in the RHU are seen by medical staff after being escorted to the RHU. (Doc. No. 115 ¶ 42.) The RHU is approximately 30-40 feet from the intake area while the infirmary is approximately 10-12 feet. (Id. ¶¶ 43, 44.) James was escorted to the RHU by a three-person team that included Defendants Masser, Baker, and Schoch. (Id. ¶¶ 45-47.) James never informed Defendants prior to his transfer that he was ill, asthmatic, transferred without the inhaler required, having trouble breathing, experiencing a racing heart, in need of IV fluids at SCI-Forest, or that he was unable to eat or drink. (Id. ¶ 48.) James was then placed in a strip cage and examined by Defendant Nurse Hyde, who conducted a visual examination of Plaintiff at the request of Masser. (Id. ¶¶ 51-53.) James informed Hyde that he was losing weight but never told her that he was experiencing the physical symptoms described above, or that he

---

[4] James contends that he advised Defendants Mains and Schmerfeld that he was asthmatic and was having difficulty breathing. (Doc. No. 28 ¶ 44.)
[5] James contends that he did inform these Defendants that he was experiencing trouble breathing and chest pain, and that he needed an inhaler. (Doc. No. 28 ¶ 72.)

required an inhaler but was not provided with one.  (Id. ¶¶ 54, 55.)[6]  Because of James' claims of weight loss, Hyde advised him to sign up for a sick call.  (Id. ¶ 57.)  James was then placed in a cell in the RHU.  (Id. ¶ 63.)

At 19:25 hours on the same day, the receiving facility nurse, Nurse Carstetter (who is not named as a Defendant), signed a Nursing Transfer Checklist that was completed by the sending facility nurse at SCI-Forest.  (Id. ¶¶ 64, 65.)  The form indicated that James had a current medical problem of asthma, and Nurse Carstetter documented that James had asthma and heard voices, but was not currently prescribed any medications.  (Id. ¶¶ 66-68.)  Nurse Carstetter scheduled James for a chronic care clinic and a psychological clinic.  (Id. ¶ 69.)  Around 20:00 hours, Defendant Nurse Alleman performed medication rounds in the RHU.  (Id. ¶¶ 72, 74.)  When medical personnel visit the RHU, they must sign in on the RHU log.  (Id. ¶ 71.)  James did not inform Alleman that he did not feel well due to difficulty breathing.  (Id. ¶ 75.)[7]

The following day, on October 12, 2012 at 10:20, James was seen for a sick call by Daya.  (Id. ¶ 76.)  James complained to Daya of nausea and vomiting.  (Id. ¶ 77.)  Daya assessed James with weight loss, ordered a diagnostic profile, and directed that he be monitored.  (Id. ¶ 78.)  Defendants Novallis, Goodwin, and Kratz were in the RHU on October 12, 2012 and James did not complain to them of a need for medical care.  (Id. ¶¶ 79, 80, 83, 84, 86.)[8]

The next morning on October 13, 2012, Defendants Rodriguez and Burrows were assigned to work in the RHU.  (Id. ¶ 88.)  James did not inform these officers that his heart was racing abnormally, that he was dizzy, or that he is asthmatic and needed his asthma inhaler, and

---

[6] James maintains that he did inform Hyde of the physical symptoms described above.  (Doc. No. 28 ¶¶ 126-37.)
[7] James contends that he did inform Alleman that he was in need of medical care.  (Doc. No. 28 ¶¶ 152-54.)
[8] James contends that he did inform these Defendants that he was in need of medical care.  (Doc. No. 28 ¶¶ 162-63, 170-72.)

these officers did not observe James as having difficulty breathing, wheezing, or gasping for air. (Id. ¶¶ 89, 91.)[9]  James was seen by Davis on October 17, 2012 for an asthma clinic.  (Id. ¶ 93.) James told Davis that he was short of breath and weak, and that his chest felt tight.  (Id. ¶ 94.) Davis assessed James with mild intermittent asthma and ordered blood work and a chest x-ray. (Id. ¶ 97.)  Davis also ordered that James be given an inhaler and noted that he should be admitted to chronic care because of chronic intermittent asthma.  (Id. ¶ 98.)  Nurse Hyde documented these instructions at 17:30 hours.  (Id. ¶ 99.)

On October 18, 2012, at approximately 13:00 hours, James was seen by the PRC.  (Id. ¶ 100.)  At that time, PRC member Deputy Superintendent Luscavage requested that James be seen by medical because James stated that he had not eaten for three days and he had a white substance around his mouth.  (Id. ¶ 101.)  James was escorted to medical and at 14:45 hours, Dr. Popick ordered that James be transported to Shamokin Area Community Hospital.  (Id. ¶¶ 102, 103.)  James was then diagnosed with acute exacerbation of asthma at the hospital and was prescribed Albuterol, Azithromycin, and Prednisone.  (Id. ¶¶ 104, 105.)  He was discharged and returned to SCI-Coal Township at 20:25 hours and placed in the infirmary.  (Id. ¶¶ 106, 107.)  At 21:35 hours, James' heart rate slowed and he reported that he was feeling more comfortable.  (Id. ¶ 111.)

On October 20, 2012, at 01:00 hours, James continued to be monitored and was resting with no complaints.  (Id. ¶ 128.)  At 07:40 hours, Davis noted that James had a small pleural effusion and ordered a soft tissue x-ray of his neck.  (Id. ¶ 130.)  On October 21, 2012, James was assessed with weight loss and pleural effusion.  (Id. ¶ 139.)  James' x-rays were taken on October 22, 2012.  (Id. ¶ 142.)  At 08:55 hours, James was seen by Dr. Popick, who noted a

_____

[9] James contends that he did inform these Defendants that he was in need of medical care.  (Doc. No. 28 ¶¶ 173-78.)

swelling of James' thyroid gland and ordered a thyroid scan immediately.  (Id. ¶ 143.)  James

was discharged back to general population at 10:00 and was assigned to the Special Needs

United ("SNU").  (Id. ¶¶ 145, 146.)

Prior to being placed in the SNU, James had been given a temporary Z code, which

meant he was to be single-celled.  (Id. ¶ 157.)  On November 7, 2012, James filed a grievance

concerning his alleged denial of medical care.  (Id. ¶ 158.)  On November 16, 2012,

Superintendent Assistant Trisha Kelley processed the grievance.  (Id. ¶ 159.)  Additionally, on

November 25, 2012, James sent various letters to personnel in the DOC's Central Office stating

that Defendants Tripp and Moser had threatened him when he sought an institutional separation

from another inmate.  (Id. ¶ 161.)  On November 29, 2012, a routine block search was

conducted, and the search included Plaintiff's cell.  (Id. ¶ 166.)  During this time, Moser, in front

of Tripp, asked James if he was ready for a cellmate.  (Id. ¶ 167.)  James responded by using

profanity and claimed these officers were threatening him.  (Id. ¶ 168.)  Defendants Moser and

Tripp asked James why he thought that they were threatening him to which James responded,

"You are making me take a cellie and going to put someone in there that will assault me, so that

is a threat."  (Id. ¶¶ 171, 172.)  Tripp tried to explain to James that he would be getting a cellmate

eventually but James replied "then I'll do what I gotta do and f**** him up," and further stated

"when I get out I'm gonna f*** you up Tripp."  (Id. ¶¶173-75.)[10]  Tripp issued James a

misconduct for making this threat, and James was then sent to the RHU.  (Id. ¶¶ 176, 177.)

James was found guilty of the misconduct by the misconduct hearing officer.  (Id. ¶ 178.)

### 2.    Eighth Amendment Deliberate Indifference to a Serious Medical Need

---

[10] James disputes paragraphs 167, 168, 171, 173-75 and contends that he never made any threats
to Defendants (Doc. No. 119 ¶ 71) and claims that Defendants had knowledge of his complaints
to the Central Office, which is why they approached him in his cell (Id. ¶¶ 78-79).

As explained above, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." <u>Rouse</u>, 182 F.3d at 197. To establish an Eighth Amendment claim based on a prison's denial of medical care, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need. <u>See</u> <u>Spruill</u>, 372 F.3d at 235. The relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) plaintiff's serious medical needs (the objective element). <u>Farmer</u>, 511 U.S. at 838-39.

Additionally, the Third Circuit has held that prison officials who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison physician. <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68 (3d Cir.1993). In <u>Spruill v. Gillis</u>, the Third Circuit expanded upon its reasoning in <u>Durmer</u>, stating that "[a]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." <u>Spruill</u>, 372 F.3d at 236.

Moreover, "to establish deliberate indifference, the plaintiff must allege more than just a single episode of errant medical treatment. Plaintiff must show that the practitioner engaged in 'persistent conduct in the face of resultant pain and risk of permanent injury.'" <u>Parker v. Frame</u>, Civ. Nos. 91-7266, 91-7278, 1992 WL 73107, at *2 (E.D. Pa. Mar. 30, 1992) (quoting <u>White</u>, 897 F.2d at 109 (holding that "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or 'to be repugnant to the conscience of mankind'")).

Here, the undisputed record evidence establishes that on October 11, 2012, James was transferred from SCI-Forest to SCI-Coal Township. (Doc. No. 115 ¶ 6.) The applicable Nursing Transfer Checklist provides that before James' transfer, he was physically able to travel and he did not have an unstable, uncontrolled, or acute condition that needed to be resolved or identified. (Doc. No. 116-1 at 5.) Upon arrival at SCI-Coal Township, James was seen by Nurse Hyde at the request of Defendant Masser in the RHU. (Doc. No. 115 ¶¶ 52, 53.) While the substance of James' specific complaints to Nurse Hyde is disputed, it is undisputed that Nurse Hyde performed a visual examination of James and told him to sign up for a sick call because of his claims of weight loss. (Id. ¶¶ 53, 57.) It is also undisputed that Nurse Carstetter provided James' medical intake and noted no current acute conditions or problems, but noted that James experienced asthma as a chronic condition and was on no medications. (Id. at 6.) She scheduled Plaintiff for a chronic care clinic and psychology clinic. (Id. at 7.)

That evening, Nurse Alleman performed medication rounds in the RHU. (Id. ¶¶ 72, 74.) While it is disputed as to whether James complained of not feeling well due to difficulty breathing, it is not contested that he was seen by Daya the following morning of October 12, 2012 for a sick call. (Id. ¶ 76.) Daya assessed James with weight loss, ordered a diagnostic profile, and directed that he be monitored. (Id. ¶ 78.) Moreover, on October 17, 2012, James was seen by Davis for an asthma clinic, wherein Davis assessed him with mild intermittent asthma and ordered blood work and a chest x-ray. (Id. ¶¶ 93, 97.) Davis also ordered that James be given an inhaler and noted that he should be admitted to chronic care because of chronic intermittent asthma. (Id. ¶ 98.)

As the facts demonstrate, James was provided medical treatment. While he vehemently challenges the adequacy of the treatment he received, this dispute does not rise to the level of a

constitutional violation. See Farmer, 685 F. Supp. at 1339 (providing that a mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment that the inmate receives does not support a claim of cruel and unusual punishment). At most, James' claims raised against the Defendants may sound in negligence. However, negligence does not give rise to an Eighth Amendment violation. See Estelle, 429 U.S. at 106 (stating that a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment") see also Gray v. Wakefield, Civ. No. 9-cv-0979, 2012 WL 4509752, at *9 (M.D. Pa. Sept. 28, 2012).

Additionally, the named Corrections Defendants who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of James, who was already being treated by medical personnel. See Durmer, 991 F.2d at 68. The record reveals that James was being treated by Daya and Davis. (Doc. No. 115 ¶¶ 76, 78, 93, 97, 98.) Specifically, a diagnostic profile, blood work, chest x-ray, and inhaler were ordered for James. (Id.) The record does not demonstrate that the non-medical Defendants had any reason to believe (or actual knowledge) that the prison doctors or their assistants were mistreating (or not treating) James, and absent this showing, "a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." See Spruill, 372 F.3d at 236. Accordingly, the Corrections Defendants' motion for summary judgment will be granted as to the deliberate indifference claim.

### 3.    James' Retaliation Claim

Corrections Defendants Else, Tripp, and Moser seek summary judgment on James' retaliation claim. (Doc. No. 114 at 16.) To state a retaliation claim under the First Amendment,

a plaintiff bears the burden of satisfying three (3) elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." Id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." Id. (quoting Suppon v. Dadonna, 2013 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." Rauser, 241 F.3d at 333-34 (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. See Lape v. Pennsylvania, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity support an inference of causation on its own. Krouse v. Am. Sterlizer Co., 126 F.3d 494, 503 (3d Cir. 1997). If the prisoner establishes a prima facie case of retaliation, the burden shifts to prison officials to show by a preponderance of the evidence that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" Watson, 834 F.3d at 422. If the prison officials can make this showing, it defeats the retaliation claim. Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002).

Here, Defendants do not dispute that James has submitted evidence to satisfy the first two prongs of Rauser. (Doc. No. 114 at 20.) Defendants argue that James has not produced any

"non-speculative evidence to establish the causation requirement" under the Rauser standard.

(Id.)  James' retaliation claim centers on the inmate abuse letters he sent to the Central Office staff.  (Doc. Nos. 120 at 10, 122-1 at 9-17.)  In these letters to the Central Office, James sought a separation against Moser and Tripp due to a fear of his safety, stating that Moser, Tripp, and Else threatened that if he continued to complain and file grievances, they would cell him with inmate Martin whom James contends he has an order of  separation – meaning they cannot be celled together.  (Doc. No. 122-1 at 12.)  Specifically, James provides that when he tried to explain to Moser and Tripp that he was to be separated from inmate Martin, who was also housed at SCI-Coal Township, Moser stated "why don't we fix you and Martin up in the cell together and see afterwards if you still have complaints?"  (Id.)  James filed the letters to the Central Office staff on November 25, 2012 as a result of this alleged threat.  (Doc. No. 119 ¶ 66.)  James was issued a misconduct on November 29, 2012.  (Doc. No. 122-1 at 21.)

In support of his argument that the misconduct was retaliatory, James relies on Tripp's statement in the misconduct, which provides, "Mr. Moser and I [Tripp] went to inmate's cell to ask him why he was claiming that we had threatened him."  (Id.)  James argues that Moser and Tripp were aware that he had filed complaints with the Central Office alleging that they threatened him and that as a result, they came to his cell and filed a false misconduct against him. (Doc. No. 132 at 9.)

Defendants counter that the record shows that Tripp and Moser were not aware that James had sent any complaints to the Central Office until the current lawsuit was filed.  (Doc. No. 115 ¶ 164.)  Therefore, they maintain that they could not have retaliated against James based upon these letters.  (Doc. No. 114 at 18.)  Moreover, Defendants contend that the language in the misconduct, "[r]ead in context and along with [Defendants'] response[s]" to James'

interrogatories, makes it "clear that the inquiry related to Plaintiff's self-perception of being threatened when he was asked to take a cellmate, not to any alleged threats in the letters to Central Office personnel." (Doc. No. 134 at 8.) In sum, Defendants argue that James' speculative and conclusory allegations that Defendants must have been aware of the letters to the Central Office does not satisfy James' duty to set forth specific facts showing that a genuine issue of material fact exists. (Doc. No. 114 at 20.)

The Court agrees with Defendants. In support of their motion for summary judgment, Defendants have produced answers to James' interrogatories and requests for admissions, as well as the declarations of Defendants that all proffer that these Defendants were not aware that James had filed these letters with the Central Office until the instant action was filed. (Doc. Nos. 114 at 21, 115 at 215, 216, 237, 253.) Consequently, the Defendants have introduced evidence that the misconduct issued to James could not have been predicated upon these letters to the Central Office if Defendants were never aware of the same.

In order for James to avoid summary judgment, he cannot rest on unsubstantiated allegations in his pleadings. See Celotex, 477 U.S. at 324. Rather, he must go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like, in order to demonstrate specific material facts which give rise to a genuine issue. Id. Suspicions, bare assertions, and conclusory allegations are not enough to survive summary judgment. Shecktor v. Louisville Ladder, Inc., Civ. No. 09-1570, 2012 WL 5052577, at *5 (M.D. Pa. Oct. 18, 2012).

A review of the record including James' verified amended complaint reveals a lack of non-speculative evidence supporting James' theory that Defendants were aware of the letters that he had written to the Central Office which resulted in the alleged retaliatory misconduct. While James cites to his verified amended complaint to support his counterstatement of facts (Doc. No.

119), and amended counterstatement of facts (Doc. No. 133), a review of his verified amended complaint reveals an utter dearth of non-speculative evidence that these Defendants actually read James' letters to the Central Office or knew of their contents before the filing of this instant action. (Doc. No. 28 at 41-43.) "[S]uch blanket assertions [by James], absent corroborating evidence, are insufficient to carry a cause of action beyond the summary judgment phase." Shecktor, 2012 WL 5052577, at *5. See also Podobnik v. USPS, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than . . . 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."). As noted by the Third Circuit, the "mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Fedorczyk v. Caribbean Cruise Lines, 82 F.3d 69, 75 (3d Cir. 1996).

The Court concludes that the only evidence James has put forward in an attempt to avoid summary judgment is mere speculation and conjecture that Defendants were aware of his letters to the Central Office that resulted in the alleged retaliatory misconduct. However, this mere possibility is not enough for James to avoid summary judgment and the Court is compelled to enter judgment in Moser, Tripp, and Else's favor as to the retaliation claim.[11]

### 4. Defendants Kulenguskey and Krzykowski

The Corrections Defendants contend that summary judgment should be granted in favor of Defendants Kulenguskey and Krzykowski because the record establishes that neither of these

---

[11] Because the Court is granting summary judgment in Defendants' favor with regard to the retaliation claim, James' verbal harassment and conspiracy claims necessarily fail. See Kramer v. Stewart, Civ. No. 05-0704, 2005 WL 1661076, at *2 n.1 (M.D. Pa. Jul. 14, 2005). Accordingly, summary judgment will be granted in favor Moser, Tripp, and Else as to the verbal harassment and conspiracy claims.

Defendants was at SCI-Coal Township or on duty at the time that James alleges that they failed to assist him with his medical concerns. (Doc. Nos. 114 at 20, 115 ¶¶ 73, 92.) James does not necessarily dispute this contention and does not provide the Court with any evidence other than unsupported assertions in his amended complaint that Kulenguskey and Kryzkowski may have been involved. (Doc. Nos. 28 ¶¶ 152-54, 178-82, 133 ¶¶ 73, 92.) The Corrections Defendants, however, support their argument with declarations as well as "sign-in" and "check-in/check-out" logs of both individuals that support their contention that they were not at SCI-Coal Township or on duty at the relevant time. (Doc. No. 116-2 at 23, 26.) Accordingly, summary judgment will be granted in favor of Defendants Kulenguseky and Krzykowski as to the deliberate indifference to a serious medical need claim.

## IV. CONCLUSION

For the foregoing reasons, James' motion to file a limited sur-reply brief (Doc. No. 138), will be denied. The Medical Defendants' motion for summary judgment (Doc. Nos. 103), will be granted and judgment entered in favor of Defendants Davis and Daya with respect to James' Eighth Amendment claim for deliberate indifference to a serious medical need. The Corrections Defendants motion for summary judgment (Doc. No. 113), will be granted and judgment entered in favor of the Corrections Defendants as to James' Eighth Amendment deliberate indifference to a serious medical need claim, retaliation, verbal harassment, and conspiracy claims, and as to all claims against Corrections Defendants Kulenguskey and Krzykowski. Lastly, James' motion to appoint counsel (Doc. No. 135), will be denied as moot. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania
